Filed 3/15/13  In re H.T. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re H.T. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E056713 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J230964 & J230965 & J230966 & J230967) |
| v. | OPINION |
| T.T. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Gregory S. Tavill, Judge.  Affirmed.

Jacob Ivan Olson, under appointment by the Court of Appeal, for Defendant and Appellant T.T.

Jesse Jack McGowan, under appointment by the Court of Appeal, for Defendant and Appellant D.T.

Jean-Rene Basle, County Counsel, Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minors.

Minors H.T. (born January 2010), G.T. (born August 2007), C.T. (born November 2005), and M.G.[1] (born October 2000) (collectively minors) came to the attention of plaintiff and respondent San Bernardino County Children and Family Services (the department) when the younger three siblings' paternal aunt called law enforcement on January 17, 2010, to report defendant and appellant D.T. (father) had left the elder three siblings in her care with no provision for support and failed to return when promised. Defendant and appellant T.T. (mother) had just given birth prematurely to H.T. and tested positively for drugs several times while in the hospital.[2]

The juvenile court removed minors from parents' custody and offered parents 18 months of reunification services. After a contested 18-month review hearing on August 16, 2011, the court terminated parents' reunification services and set the Welfare and Institutions Code section 366.26 hearing.[3] On April 12, 2012, the juvenile court suspended parents' visitation with the three younger siblings, upon the department's

---

[1] M.G.'s biological father was never located and, thus, was never a party to the proceedings below and is not a party on appeal.

[2] The department indicated in its reports that H.T. was taken into protective custody due to drug exposure in utero or at birth; however, the record also indicates H.T. tested negatively for drugs at birth.

[3] All further statutory references are to the Welfare and Institutions Code.

request, in order that they might "adjust and stabilize in their" new prospective adoptive placement.

Mother filed a section 388 petition on May 29, 2012, requesting minors be returned to her custody or, in the alternative, reunification services be reinstated with unsupervised overnight and weekend visitation with minors. Father filed a section 388 petition on July 5, 2012, requesting the same relief as mother. After a combined, contested sections 388 and 366.26 hearing, the juvenile court denied parents' section 388 petitions, found adoption as the permanent plan, terminated parental rights as to the younger three siblings, and ordered a permanent plan of foster care placement for M.G. Parents appeal contending the juvenile court deprived them of constitutionally requisite due process in terminating their visitation with the three younger siblings and failed to correct that error during the section 388 hearing, thus depriving them of the ability to establish a parental benefit exception to termination of parental rights. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

The paternal aunt of the three younger siblings reported that on January 14, 2010, father called and asked her to come to the parents' home in Big Bear and watch the three eldest children for a day. Mother was in the hospital having just given birth to H.T. Paternal aunt noted there was no heat in the home and the temperature was below freezing. All the children were sick. There was only enough food for a day. There was an eviction notice on the table indicating the family must vacate the home by January 27, 2010.

3

On January 15, 2010, when father did not return, paternal aunt called father, but he did not answer. On January 16, 2010, she called again to no avail. A neighbor took her and the children back to Corona where paternal aunt lived. Paternal aunt then called mother; mother told her she would not come get the children. Paternal aunt told mother that if someone did not come pick up the children she would call the department and the police. Mother told her to "'do what you have to do.'"

On January 17, 2010, paternal aunt had still not heard from father. Since she only rented a room in another family's home, she could not continue to keep the children there. Therefore, she contacted law enforcement. By the time an officer arrived, mother had called and asked to speak with M.G. M.G. told paternal aunt that mother asked her to sneak out of the home and meet mother on the corner. Mother told her she was going to leave the two other children with paternal aunt. The officer called the hospital where mother had given birth; mother had been discharged, but was there visiting H.T. Mother told the officer she was not going to come get the children because it was not her idea to leave them with paternal aunt. She said it was father's doing and she would not get involved.

Mother denied planning on picking up M.G., but asked to speak with her. The officer put M.G. on speaker phone with mother; mother started yelling at M.G. for disclosing their plan. Father then called paternal aunt and asked her "what the hell" she was doing calling the police; he said he was too busy to pick up the kids "'at her beck and call'" and she would have to "'deal with it.'"

Paternal aunt reported mother had just gotten out of jail for child abuse. M.G. did not want to return home. She said she needed a break from taking care of the children: she regularly changed their diapers, fed them, put them to bed, and kept them out of trouble. Minors were dirty, had filthy hair, and ill-fitting clothes.

On January 18, 2010, the social worker visited the Arrowhead Regional Medical Center's Neonatal Intensive Care Unit where H.T. was hospitalized. She had been born at 33 weeks of gestation (seven weeks early) and would require two to three more weeks of hospitalization due to being born premature and suffering continuing seizures.

Mother had been drug screened at the hospital, on admission, on January 7, 2010, and tested positively for opiates; on January 10, 2010, positively for cocaine and opiates after going missing from the unit for four hours; and on January 11, 2010, positively for opiates. Mother was discharged from the hospital on January 14, 2010, and last visited on January 16, 2010.

Mother had 19 prior dependency referrals occurring in San Bernardino, Imperial, Riverside, and Los Angeles Counties, of which eight were substantiated.[4] Regarding the most recent dependency referral, the department had provided mother with $2,925 to pay back rent and $515 in vouchers to purchase winter clothes for minors on December 29, 2009. Mother's criminal history consisted of 13 prior convictions for offenses including contempt of court, infliction of corporal injury on a spouse, false identification to a peace officer, six prostitution convictions, two convictions for possession of a controlled

---

[4] A later report reflected a total of 27 referrals to various county departments with respect to mother, of which five resulted in removal of some or all of mother's children.

substance, and assault with a deadly weapon. Father's criminal history included seven convictions for theft of utility services, four robberies, driving with a suspended license, and possession of cocaine base for sale.

The department filed a juvenile dependency petition alleging numerous allegations against parents including mother's substance abuse problems, parents' failure to protect and provide for minors, and parents' criminal histories. The juvenile court ordered minors detained on January 22, 2010. In the February 11, 2010, jurisdiction and disposition report, the social worker noted H.T. had been released from the hospital on February 5, 2010, and was placed in a certified medically fragile foster home. Mother had been evicted on January 27, 2010, reported living in a hotel in San Bernardino, and filed a JV-140 form indicating she was transient. The social worker reported M.G. had been the primary caregiver for her younger siblings for a long period of time.

The juvenile court continued the jurisdictional hearing to permit mediation. The mediator's report reflects the department agreed to dismiss some of the allegations, mother submitted on the report on other allegations, mother would contest some of the allegations, and the department agreed to dismiss the allegation of substance abuse if mother drug tested clean on the day of mediation, otherwise mother agreed to participate in substance abuse treatment if the result were positive.[5]

In an addendum report dated March 23, 2010, the social worker noted mother failed to drug test by March 11, 2010, as agreed in mediation. Mother had also been

_____

[5] Father was not present at mediation. Father reported working on an offshore oil rig and was unavailable for visitation or appearances.

6

arrested for vehicle theft on March 4, 2010. Mother canceled visitation on March 3, 2010; declined to visit on March 11, 2010; arrived 65 minutes late for visitation on March 16, 2010; and arrived 52 minutes late for visitation on March 17, 2010. Father missed all visits except the first one on February 18, 2010, to which he was 15 minutes late.

C.T. had been found to be significantly behind in his inoculations; he had the immunization history of a two month old rather than that of the four and one half year old he was. He had also been diagnosed with rampant cavities including extensive oral decay and dental abscesses. A dental specialist recommended on March 16, 2010, that C.T. undergo nine extractions and have silver caps placed on his remaining teeth; four teeth were eventually removed and four crowns placed.

After the contested jurisdictional hearing on April 6, 2010, the juvenile court found minors dependents of the court, removed them from parents' custody, ordered reunification services for parents, offered supervised visitation between mother and minors for one hour weekly, and two hours weekly with H.T.

The social worker's report filed September 23, 2010, as to the elder three minors, reflected mother tested positive for Methadone on July 20, 2010, but after insisting she had not used, a confirmatory test showed a negative result. Nevertheless, mother failed to show for drug tests scheduled for July 29, August 18, and 27, and September 13, 2010. Mother failed to show for a substance abuse outpatient treatment program intake appointment she scheduled for September 3, 2010, to which she was referred on June 16, 2010.

Parents failed to show for about half the weekly visits scheduled. They were then requested to call 24 hours in advance to confirm visitation; however, after confirming visits they would still fail to show. Parents completed six individual therapy sessions.

A subsequent report filed September 29, 2010, with regard to H.T., reflected mother refused to participate in an outpatient substance abuse treatment program. Parents had now completed eight sessions of individual therapy; however, they had failed to participate in a parenting class. Mother visited with H.T. 22 times between March 9, 2010, and August 21, 2010, but had missed 10 scheduled visits. Father visited with her on 19 occasions. Father now reported working in the construction industry until April when he was reportedly diagnosed with diabetes. The department recommended terminating parents' reunification services as to H.T.

In a status review report filed March 25, 2011, the social worker recommend parents' reunification services be terminated as to all minors. Parents had been terminated from a parenting class in October. Parents both reported completing a parenting class at another facility, but the social worker did not recognized the entity.[6] Parents missed two of four scheduled visits with minors in January 2011.

Mother was denied entry into a substance abuse treatment facility due to her denial that she had a substance abuse problem. Meanwhile mother failed to show for drug testing scheduled for October 12, November 24, December 3, 2010, January 18, and February 2, 2011. Mother tested positively for Methadone on December 22, 2010, and

---

[6] Parents provided the department with certificates of completion of a parenting course, but the certificates did not identify the organization providing the course.

January 4, 2011; confirmatory tests conducted at mother's insistence both confirmed the positive results. Mother tested positively for Methadone, opiates, and Oxycodone on February 22, 2011; a confirmatory test substantiated the results. Mother was under investigation for fraud for receiving social security benefits on behalf of her older boys while they were in juvenile hall.

At the 12-month review hearing on April 25, 2011, mother admitted missing drug tests and spending five days in jail for failing to appear on her vehicle theft case. Mother testified father had been taken into custody on February 14, 2011, and spent 30 days in jail. Mother testified she had completed 12 individual therapy sessions, a parenting program, and took a follicle drug test in October 2010 on her own, which reflected negatively for all illicit substances.[7]

Father testified he had completed two parenting courses. Father conceded he had recently pled guilty to felony grand theft and was on probation after spending 39 days in jail. Father testified the last time he worked was on August 2, 2002, but that he does not now work due to his diabetes, which caused his vision to come and go.

The social worker testified she had confirmed parents' participation in a six-week parenting course at a facility of which she had never heard; the minimum number of weeks required by the department for a parenting program is eight weeks. She could not confirm whether the substance of the parenting program met the department's

---

[7] No documentation of the follicle drug test results appears in the record.

requirements either. Parents had only visited approximately half their allotted times. Mother most recently tested positive for Methadone on March 7, 2011.

On the second day of the hearing, parents' previous social worker, who had previously been a certified drug recognition expert as a Los Angeles police officer and worked five years in counter narcotics operations as a research officer for the National Interagency Counterdrug Institute under the National Guard Bureau, testified that, contrary to mother's assertions, mother's taking of prescription medications could not have resulted in her positive drugs tests. Father testified the parenting program that he and mother completed consisted of two hours weekly for six weeks; thus, meeting the department's time requirement of a minimum of eight weeks.

The juvenile court found parents "haven't benefitted from services. Mom is in total denial." "I don't believe that they complied with the spirit [of] the requirements." The court concluded that it wanted parents to take an approved parenting course, mother to enroll in and complete a substance abuse class, mother to sign a release for her medical records, and mother to engage in conjoint counseling with M.G. Therefore, the court continued reunification services for parents as to all minors.

In an interim review report filed June 17, 2011, the social worker noted mother had enrolled in a 90-day outpatient substance abuse program on May 5, 2011. As of June 16, 2011, mother had missed 10 out of 18 sessions. As of the same date, parents had only attended three parenting classes. M.G. had stopped attending visits after May 4, 2011, after complaining she no longer wished to engage in them; the department was disinclined to force her to participate in the visits. M.G. was likewise not open to

conjoint counseling with Mother and her therapist recommended against it advising that M.G. needed further individual counseling first.

Parents last visited with the younger minors on May 18, 2011, having missed every scheduled visit since. Parents provided the department with a new certificate dated April 20, 2011, of their previous completion of the six-week parenting course, which now indicated the facility administering the program. The department was also provided letters dated October 15, 2010, and January 26, 2011, confirming the substance abuse treatment program would not enroll an individual who did not admit to a drug problem, or who did not have non-hospital positive drug test results.

In the July 7, 2011, Status Review Report, the social worker recommended a planned permanent living arrangement for M.G., termination of reunification services for parents as to all minors, and the setting of the section 366.26 hearing. The department had received a child abuse referral on parents on June 21, 2011, regarding mother's two older sons. Mother tested positively for Methadone, opiates, and PCP on June 13, 2011. As of June 22, 2011, mother had so many absences from her outpatient substance abuse treatment program that she would be required to attend six classes for the ensuing month with no absences just to get caught up in order to complete the six-month program on time.[8]

Parents continued to miss approximately half of their scheduled visits with minors. Parents had enrolled in a 12-week parenting class on May 19, 2011; they attended their

---

[8] The program did not permit enrollees to surpass the six-month deadline.

11

first class on May 25. 2011.  As of June 30, 2011, they had attended five classes and missed one.

In an addendum report filed July 13, 2011, the social worker noted mother failed to show for drug testing scheduled for June 24, 2011.  Mother had been arrested for inflicting corporal injury on father on July 5, 2011.

At the continued, contested 18-month hearing on August 16, 2011, father testified he was separated from mother and had not seen her in a month.  He had two more classes left to complete his 12-week parenting course.[9]  He had not visited minors since July 2011.  The juvenile court terminated parents' reunification services and set the section 366.26 hearing.  The court ordered father have two hour weekly visitation with minors, with father to call 24 hours in advance to confirm visitation.

Mother's substance abuse progress report dated August 16, 2011, reflected mother had missed four sessions in May, eight sessions in June, four sessions in July, and three sessions in August.  Mother tested negatively with the program on June 27, and July 11, and 14, 2011.

In the section 366.26 report filed December 1, 2011, the social worker requested a 120-day continuance in order to find a new home for M.G., whose foster home had been

---

[9] The social worker testified she had spoken with the program facilitator the day before, who told her father had three remaining classes.

12

decertified. Parents had not visited with minors since June 2011;[10] minors had not mentioned parents at all. The juvenile court granted the continuance.

In an addendum section 366.26 report, the social worker requested a 60-day extension to allow younger siblings to "adjust and stabilize" in their new prospective adoptive placement. Parents had started visiting twice monthly in January 2012, although the juvenile court's orders permitted weekly visitation. Father did not stay for the entire duration of the visits he did attend.

The department canceled visitations with parents on April 5, 2012, to facilitate placement of minors in an adoptive home. The social worker wrote that "Continued visitations with the birth parents during this time of transition into permanency will continue to confuse the children." The social worker requested "visits be suspended in order to support safety of the children and confidentiality of the adoptive family."

At the hearing on April 12, 2012, father's attorney posited, "The report seems to suggest that the Court should suspend my client's visits." The department's attorney confirmed, "That is the request." After argument the juvenile court ordered visits for M.G. "once a month for one hour. If M.G. wants to visit more than that, the social worker has authority to accommodate M.G.'s desires." The court further suspended visits with the younger siblings finding the visits detrimental to minors.

On May 29, 2012, mother filed a JV-180 petition requesting minors be returned to her or, in the alternative, reunification services be reinstated and she be provided with

---

[10] Though a later report reflected parents had last visited in July 2011.

13

visitation, including unsupervised overnight and weekends visits. Mother noted she had completed a 12-week parenting class and was participating in an outpatient substance abuse program. Mother enrolled in the substance abuse program on February 16, 2012, had completed 20 sessions, had four absences, and had tested negatively for controlled substances on March 15, and 28, 2012. Mother contended the change was in minors' best interests because "I love my children and believe that it would be in their best interest to be raised by their mother."

In a subsequent report filed May 31, 2012, the social worker observed, "M.G. has had very sporadic contact with her mother and step-father. She has stated that she does not like her step-father and does not want to visit him at all. She has attended some of the visits that resumed between January and April 2012, and some visits she has chosen not to attend." On July 5, 2012, father filed a JV-180 petition requesting relief identical to mother's. Father reported he had completed a 12-week child abuse prevention and parenting course. He contended he had a safe, stable home and was now employed. He asserted the relief requested was in minors' best interest because "I love my children very much. I can and will provide them with a safe, stable home."

At the combined, contested sections 388 and 366.26 hearing on July 16, 2012, mother testified she had completed her six-month substance abuse program. She now lived in a home with father; father had inherited $1.5 million dollars with which they planned to open a "99-cent store." Mother testified she and father got back together the day after the domestic violence incident. She did not participate in a domestic violence

14

program, because one was unnecessary. She never provided the social worker with a release regarding her substance abuse program because that information was confidential.

Father testified he had a good relationship with minors. C.T. and his daughters always ask when they will be going home to him. Father did not get back with mother until about a month after the domestic violence incident. He did not visit minors between July 2011 and January 2012 because he believed visitations had been terminated.

The social worker testified parents had visited once in June 2011, and then on July 11, 2011. Their next visit did not occur until January 6, 2012, and the following visit occurred on February 7, 2012; this despite the court's order that parents have visitation weekly during the entire period. Mother refused to sign a release regarding her participation in a substance abuse treatment program.

The juvenile court found "that the parents have not benefitted from the services that they have received. There has been no change in circumstances[.] [¶] . . . [I]t is not in the best interest of the children to grant the [section] 388 [petitions]. As such, both of them are hereby denied." The court found adoption as the permanent plan for C.T., H.T., and G.T. It therefore terminated parents' parental rights as to the younger siblings. With respect to M.G., the court ordered a permanent plan of foster placement.

## DISCUSSION

Father contends the juvenile court erred in denying his section 388 petition, because it failed to correct its error in previously terminating visitation such that father was effectively barred from raising the beneficial parental relationship exception to termination of parental rights. Mother joins in the issues raised in father's briefs. We

15

hold that any appellate contention with regard to the juvenile court's order discontinuing visitation on April 12, 2012, is untimely because parents failed to timely file a notice of appeal or notice of intent to file a writ petition from that order.

Likewise, parents forfeited any issue regarding the court's termination of visits by failing to object on that basis in their section 388 petitions, or at the hearing on the petitions. Moreover, we hold on the merits that parents received constitutionally appropriate due process prior to having their visitation terminated. Finally, any error was harmless because parents could not have established the requisite relationship with minors in the last three months of the dependency sufficient to satisfy the beneficial parental relationship exception to termination of parental rights.

A.     TIMELINESS

All orders in a dependency proceeding subsequent to the dispositional order, except orders setting a section 366.26 hearing, are directly appealable. (*In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1150; *In re S.B.* (2009) 46 Cal.4th 529, 531-532; § 395(a)(1).) "'"A consequence of section 395 is that an unappealed . . . postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order." [Citation.]' [Citations.]" (*In re S.B.*, at p. 532.) A party seeking to file a petition for extraordinary writ from an order setting a section 366.26 hearing must file a notice of intent to seek such review within no more than 37 days of the order challenged, depending on the circumstances. (Cal. Rules of Court, rule 8.450(e)(4).) A party seeking to appeal a postdisposition order must file a notice of appeal within 60 days of the order being appealed. (Cal. Rules of Court, rule 8.406(a)(1).)

16

The April 12, 2012, order terminating parents' continued visitation with minors was a postdispositional order because it postdated the dispositional order on April 6, 2010. Thus, the order was separately appealable. Father filed his notice of appeal in the instant case on August 30, 2012, long after the 60 days permissible for appeal had expired. Similarly, mother filed her notice of appeal on July 18, 2012, after expiration of the time to appeal. *In re Lance V.* (2001) 90 Cal.App.4th 668 (*Lance V.*), one of the cases primarily exposited by father itself underscored the direct appealability of postdispositional orders changing visitation. (*Id*. at p. 673.) Therefore, any contention the juvenile court erred in suspending visitation has been forfeited by the failure of parents to timely appeal that order.

B.     FORFEITURE

To the extent parents maintain the order terminating their visitation was challengeable via their section 388 petitions, which effectively requested a modification of that order, we hold parents forfeited the issue by failing to raise it below. "[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.]" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. omitted.)

Although it is true parents were effectively attempting to negate the order terminating visitation with their section 388 petitions, the section 388 petitions in this case were not specific challenges to that order, but requested the status quo in its entirety be modified. (See *In re Amber M.* (2002) 103 Cal.App.4th 681, 685-686; *In re Kimberly*

17

*F.* (1997) 56 Cal.App.4th 519, 528; *In re Marilyn H.* (1993) 5 Cal.4th 295, 309; *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) Here, parents did not mention the April 12, 2012, order terminating visitation in their petitions or at the hearing on those petitions. Moreover, parents' petitions did not merely request expiation of the order terminating visitation, but requested return of minors to their custody, in which case the order terminating visitation would have been irrelevant.

Furthermore, parents requested alternative relief consisting of reinstatement of reunification services and unsupervised overnight and weekend visitation. Thus, parents' section 388 petitions did not seek to return parents' visitation to that in existence prior to the order of April 12, 2012, but sought extensively more than the once weekly visitation permitted before the order terminating visitation. Therefore, parents forfeited any argument the court erred by terminating visitation by failing to raise the issue in their section 388 petitions or at the hearing on those petitions. Indeed, parents were not arguing the juvenile court erred in terminating their visitation; rather, parents contended circumstances had since changed to such a degree that modification of that order, and other previous orders, was now in the best interests of minors.

C.  DUE PROCESS

Father argues that he was deprived of constitutionally requisite due process in the juvenile court's termination of his visitation three months before it terminated his parental rights. We disagree.

"Parents have a fundamental interest in the care, companionship, and custody of their children. [Citation.] [M]inimal due process requirements [apply] in the context of

18

state dependency proceedings. 'Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence.' [Citation.] 'After the State has established parental unfitness at that initial proceeding, the court may assume at the *dispositional* stage that the interests of the child and the natural parents do diverge.' [Citation.]" (*In re Gladys L.* (2006) 141 Cal.App.4th 845, 848.)

"After termination of services, the focus shifts from the parent's custodial interest to the child's need for permanency and stability. [Citation.] 'Whether a previously made order should be modified rests within the dependency court's discretion, and its determination will not be disturbed on appeal unless an abuse of discretion is clearly established.' [Citation.] The denial of a section 388 motion rarely merits reversal as an abuse of discretion. [Citation.]" (*In re Amber M.*, *supra*, 103 Cal.App.4th at pp. 685-686.)

Here, the department canceled visitation scheduled for April 5, 2012, in order to facilitate placement of minors in an adoptive home. "The juvenile court cannot impermissibly delegate to the [department] . . . unlimited discretion to determine whether visitation is to occur. [Citation.]" (*In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1505.) Thus, the department's cancellation of the visitation scheduled for April 5, 2012, violated parents' due process because the department failed to obtain court approval for what amounted to a violation of the court's previous order granting weekly visitation.

Nonetheless, this record reflects the department canceled only one visit without court approval. The department's supplemental report filed April 11, 2012, noting the

19

cancellation of that one visit, observed, "Continued visitations with the birth parents during this time of transition into permanency will continue to confuse the children." The social worker recommended "visits be suspended in order to support safety of the children and confidentiality of the adoptive family." Thus, parents were provided notice of the department's request that visitation be terminated. Indeed, at the hearing the next day, father's counsel observed, "The report seems to suggest that the Court should suspend my client's visits." The department confirmed father's counsel's observation: "That is the request." Thus, parents were notified prior to the hearing the department was seeking termination of visitation.

Moreover, parents were given the opportunity to argue the issue prior to the court's order terminating visitation. Therefore, parents were not deprived of due process by the court's order terminating visitation because they were notified of the department's request and given the opportunity at the hearing to challenge that request.

Father notes the report requesting termination of visitation was issued the day before the hearing. Thus, father argues parents were not given adequate notice of the request. Moreover, father observes counsel below noted the unavailability of the social workers for cross-examination. Furthermore, father argues the only proper method for requesting a change in the visitation order is the filing of a section 388 petition; hence, the department's failure to file a section 388 petition requesting termination of visitation deprived the juvenile court of authority to hear the request. (*Lance V.*, *supra*, 90 Cal.App.4th at p. 675 ["When a change in orders is being sought and the pertinent

statutes do not otherwise provide a method for change, the proper method is a motion pursuant to section 388."].)

Although father's observations withstand scrutiny, father's obvious remedy was to request a continuance so the issue of visitation could be determined at a contested evidentiary hearing sometime in the near future. Neither parent requested such a continuance. Moreover, we do not read *Lance V.* as narrowly as father such as to permit a change in ordered visitation solely upon the filing of a section 388 petition. The change in visitation order at issue in *Lance V.* took place after the disposition order, but prior to any termination of the parents' reunification services. (*Lance V.*, *supra*, 90 Cal.App.4th at p. 673.) Here, the order terminating visitation occurred at a further section 366.26 hearing after parents' reunification services had already been terminated, when the focus had shifted "to the needs of the child for permanency and stability." (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 309.) Thus, to the extent parents contend the late notice of the request and the lack of an evidentiary hearing violated their due process, they forfeited that right by failing to object or request a continuance.

D.    HARMLESS ERROR

Even assuming the juvenile court erred in denying parents' section 388 petitions by failing to revisit its previous order terminating their visitation with minors, we find such error harmless.

"If the outcome of a proceeding has not been affected, denial of a right to notice and a hearing may be deemed harmless and reversal is not required. [Citation.]" (*In re James F.* (2008) 42 Cal.4th 901, 918.) Under section 366.26, subdivision (c)(1)(B)(i) an

21

exception to termination of parental rights exists where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." The parent has the burden of proving termination would be detrimental to the child. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350; *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1207.)

Here, father initially left the elder minors with the paternal aunt ostensibly for one day, but in actuality for at least three days, without provision for support in a home without heating and from which the family would be evicted within two weeks. Father informed the department he was unavailable for visitation during the initial stages of the dependency proceedings because he worked on offshore oil rigs in various states. However, he later informed the department he had been working in construction until diagnosed with diabetes in April 2010. Still later, father testified he had last worked on August 2, 2002.

Parents cancelled visitation on March 3, 2010. Mother declined visitation on March 11, 2010, and arrived 65 minutes late to a two hour visit on March 16, 2010. Mother arrived 52 minutes late for visitation on March 17, 2010. As of March 23, 2010, father had missed all visits except the first on February 18, 2010, to which he was 15 minutes late. Through April 25, 2011, parents still missed half their scheduled visits even when they confirmed by phone 24 hours earlier that they would make visitation.

Father missed all visitation between February 14, 2011, and March 24, 2011, while in jail. Father visited with minors on May 18, 2011, but missed every scheduled visit between then and June 17, 2011. M.G. had stopped attending visitation, informing

22

the social worker she no longer wished to visit with parents, but particularly with father. Parents did not visit minors at all between July 11, 2011, and January 6, 2012. Minors did not even mention parents during this six-month absence.

When visits resumed in January 2012, C.T. and G.T. became defiant and disruptive afterward. Parents still only visited two to three times monthly, when the court had permitted weekly visitation, and visited only once in February 2012. Father did not even stay for the entirety of the visits he then did attend. The social worker reported C.T. and G.T. were "'no more bonded to [parents] than any of their other foster parents.'" The social worker had determined that M.G. had been the younger siblings' primary caregiver "for a long period of time" prior to the instant dependency proceedings.

Under these circumstances, where parents apparently did not have a beneficial parental relationship with minors before the instant dependency proceedings, it is difficult to see on this record how they would have demonstrated one even with an additional three months of visitation. Parents here missed approximately half the visitation they were allotted even when they did visit. Parents missed six months of visits entirely. H.T. was essentially born into the dependency proceeding and M.G. wanted a break from parenting her younger siblings.

Parents did not maintain the requisite regular visitation and contact with minors, could not establish detriment to minors by the termination of parents' parental rights, and the department established detriment to minors if visitation continued. Thus, had the juvenile court denied the department's request for termination of visitation, and had parents attended every visit permitted during that three month period, it is simply

23

unfathomable to discern how they could have established and maintained a relationship with minors that they never had before.  Thus, any error was harmless.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

RICHLI
Acting P. J.

KING
J.

24